IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

DEC 09 2016

JULIA C. DUDLEY, CLERK
BY: _____
DEPUTY CLERK

UNITED STATES OF AMERICA                )
                                        )    Criminal Action No. 3:14CR00016
v.                                      )
                                        )    **MEMORANDUM OPINION**
DANIEL LAMONT MATHIS, et al.,           )
                                        )    By: Hon. Glen E. Conrad
        Defendants.                     )    Chief United States District Judge

On October 22, 2014, Halisi Uhuru ("Halisi"), Anthony Darnell Stokes ("Stokes"), and four codefendants were charged in a multi-count superseding indictment. Halisi and Stokes were named in the first count of the superseding indictment, which charged the defendants with conspiracy to participate in a racketeering enterprise, in violation of 18 U.S.C. § 1962(d). They were also charged with obstruction of justice, in violation of 18 U.S.C. § 1512(c)(1), based on their involvement in the enterprise's efforts to conceal and destroy evidence associated with the robbery, abduction, and murder of Kevin Quick. All six defendants proceeded to trial in February of 2016, and were convicted of each offense with which they were charged. On November 28, 2016, the court conducted a hearing on the motions for judgment of acquittal filed by Halisi and Stokes, and the parties' written objections to the United States Probation Office's calculations under the United States Sentencing Guidelines. This memorandum opinion sets forth the court's rulings on those motions and objections.

## I.    Motions for Judgment of Acquittal

The defendants' motions for judgment of acquittal challenge the sufficiency of the evidence to support their convictions. When a motion for judgment of acquittal is based on a claim of insufficient evidence, the jury verdict "must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it." Glasser v. United States, 315

U.S. 60, 80 (1942). "Substantial evidence is evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." United States v. Green, 599 F.3d 360, 367 (4th Cir. 2010) (citation and internal quotation marks omitted). In determining whether substantial evidence supports a verdict, the court considers both circumstantial and direct evidence, drawing all reasonable inferences from such evidence in the government's favor. United States v. Harvey, 532 F.3d 326, 333 (4th Cir. 2008). The court does not reweigh the evidence or reassess the jury's determination of witness credibility, United States v. Brooks, 524 F.3d 549, 563 (4th Cir. 2008), and can overturn a conviction on insufficiency grounds "only when the prosecution's failure is clear," United States v. Moye, 454 F.3d 390, 394 (4th Cir. 2006) (citation and internal quotation marks omitted). Thus, a defendant challenging the sufficiency of the evidence must overcome a "heavy burden." United States v. Engle, 676 F.3d 405, 419 (4th Cir. 2012).

### A.    Count 1

As set forth above, Count 1 of the superseding indictment charged the defendants with conspiracy to participate in a racketeering enterprise, in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(d). RICO makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ." 18 U.S.C. § 1962(c). A "pattern of racketeering" consists of "at least two acts of racketeering activity" occurring within a ten-year period, 18 U.S.C. § 1961(5), which are "related" and "pose a threat of continued criminal activity." H.J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 239 (1989). These "[r]acketeering acts, often referred to as predicate acts, include any act or threat involving

2

murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance chargeable under state law and punishable by imprisonment for more than one year." United States v. Cornell, 780 F.3d 616, 623 (4th Cir. 2015) (citing 18 U.S.C. § 1961(1)(A)). The predicate acts also include "any act which is indictable under [certain] provisions of title 18," including "section 1512," 18 U.S.C. § 1961(1)(B), which makes it unlawful to "corruptly . . . alter[], destroy[], mutilate[], or conceal[] a record, document, or other object, or attempt[] to do so, with the intent to impair the object's integrity or availability for use in an official proceeding," 18 U.S.C. § 1512(c)(1).

Halisi and Stokes were convicted under RICO's conspiracy provision, which prohibits anyone from conspiring to violate the provisions of 18 U.S.C. § 1962(c). See 18 U.S.C § 1962(d). To satisfy § 1962(d), the government must prove the following elements: (1) "that an enterprise affecting interstate commerce existed"; (2) "'that each defendant knowingly and intentionally agreed with another person to conduct or participate in the affairs of the enterprise"; and (3) "that each defendant knowingly and willfully agreed that he or some other member of the conspiracy would commit at least two racketeering acts." United States v. Mouzone, 687 F.3d 207, 218 (4th Cir. 2012) (citation and internal quotation marks omitted). Unlike the general conspiracy statute applicable to federal offenses, 18 U.S.C. § 371, § 1962(d) does not require the commission of any overt or specific act in furtherance of the conspiracy. Salinas v. United States, 522 U.S. 52, 64 (1997). Instead, an agreement is sufficient. Id.; see also Mouzone, 687 F.3d at 218.

### 1.    **Halisi's Motion**

In seeking judgment of acquittal on Count 1, Halisi argues, as he did during trial, that the evidence connecting him to the alleged enterprise in this case, the 99 Goon Syndikate, was

insufficient. He points out that he was incarcerated during part of the charged time frame of the conspiracy, that he did not personally recruit all of the other members of the 99 Goon Syndikate, that he did not order or direct any of the specific robberies committed by other members, and that he had no involvement in the actual kidnapping and murder of Kevin Quick. According to Halisi, the government's evidence showed that he was merely associated with the charged enterprise, not that he knowingly and willfully agreed to participate in its affairs.

Viewing the evidence in the light most favorable to the government, however, the court concludes that there is substantial evidence in the record to support the jury's verdict on Count 1. The evidence at trial, which included the testimony of gang members Anthony White, Devante Bell, and Shiquan Jackson, the gang's documents and "books of knowledge," and text messages sent by Halisi and his codefendants, demonstrated that Halisi was the highest-ranking member of the 99 Goon Syndikate, which was a criminal enterprise of commonly associated individuals who engaged in multiple acts of racketeering for the mutual benefit of the gang's members and the gang itself. As the highest-ranking member of the 99 Goon Syndikate, Halisi was responsible for passing down the gang's lingo and rules to other members of the enterprise. He also mentored and provided guidance to lower ranking members of the gang, such as Shantai Shelton, who was advised by Halisi that she would ultimately move up in rank if she continued to "put in work." Halisi's message to Shantai was consistent with other evidence introduced by the government, which indicated that members of the 99 Goon Syndikate were expected to "put in work," which meant, in essence, to commit robberies and other racketeering acts. By committing these criminal acts, as gang insider Anthony White testified, members of the enterprise hoped that they would earn both respect and rank, and ultimately move up in the organization.

While there is no evidence that Halisi ordered, directed, or was personally involved in any of the particular robberies that were committed by members of the 99 Goon Syndikate, the government's evidence established that Halisi benefitted from the acts of racketeering committed by other gang members. For instance, Halisi received a .38 caliber revolver from Anthony White that had been taken from the residence of Michael Shaffer, and then bragged to a witness that he had gotten it from one of his "homies" who had been "putting in work." See Dkt. No. 704 at 35. The government's evidence also established that Halisi was personally involved in at least two acts of racketeering, namely conspiracy to distribute narcotics and obstruction of justice.

Although Halisi is correct "that the RICO conspiracy statute does not 'criminalize mere association with an enterprise,'" Mouzone, 687 F.3d at 218 (citation omitted), the evidence in this case illustrates far more than his "mere association" with the 99 Goon Syndikate. When construed in the government's favor, the record clearly shows that Halisi was aware of the nature of the enterprise, that he was a leader of the enterprise who guided other members, that he received the proceeds of racketeering acts committed by lower-ranking members, and that he directly participated in at least two racketeering acts underlying the alleged conspiracy. In light of such evidence, it simply cannot be said that Halisi was a mere associate of the 99 Goon Syndikate. Accordingly, his motion for judgment of acquittal on Count 1 must be denied.

### 2.    Stokes' Motions

Stokes has also moved for judgment of acquittal on Count 1. In addition to adopting the joint motion for judgment of acquittal filed by Daniel Mathis and Kweli Uhuru, as well as the motion for judgment of acquittal filed by Halisi, Stokes' current counsel has filed on his behalf a motion challenging the sufficiency of the evidence with respect to the third element set forth in

Mouzone.[1]  Specifically, Stokes argues that the government failed to prove that he "knowingly and willfully agreed that he or some other member of the conspiracy would commit at least two racketeering acts."  Mouzone, 687 F.3d at 218.  For the following reasons, the court concludes that the evidence presented by the government, when viewed in its favor, was sufficient to allow a reasonable jury to find that Stokes personally committed at least two racketeering acts.[2]  Accordingly, Stokes' motion for judgment of acquittal based on the third element will be denied.

First, as Stokes seemingly concedes in the memorandum filed in support of his motion, the government's evidence demonstrated that he committed multiple acts establishing his participation in a conspiracy to distribute narcotics.  While Stokes argues that the narcotics conspiracy was unrelated to the 99 Goon Syndikate, there was ample evidence from which the jury could reasonably find to the contrary.[3]  The government's evidence demonstrated that Stokes was the second-highest-ranking member of the 99 Goon Syndikate, and that the gang

---

[1]  For the reasons stated in the court's previous memorandum opinion denying the motion filed by Daniel Mathis and Kweli Uhuru, the court will deny Stokes' motion adopting the arguments made by his co-defendants.  Likewise, in light of the evidence presented by the government, it cannot be said that Stokes was a "mere associate" of the 99 Goon Syndikate.  Accordingly, the court will deny Stokes' motion adopting the arguments made by Halisi Uhuru.  Finally, the court is unable to conclude that any of the additional arguments raised in Stokes' pro se motions warrant a judgment of acquittal.  Thus, those motions will also be denied.

[2]  In addition to arguing that he did not personally commit any qualifying racketeering acts, Stokes argues that the government's evidence was insufficient to establish that he agreed that other members of the conspiracy would commit certain of the predicate acts alleged in the superseding indictment, such as the various acts of robbery that were committed by his fellow gang members.  Relying on the Fourth Circuit's recent decision in United States v. Barnett, No. 14-4866, 2016 U.S. App. LEXIS 18394 (4th Cir. Oct. 12, 2016), Stokes contends that the government failed to identify any "specific act of . . . robbery" to which he agreed, and that without such evidence, "no reasonable juror could find, based solely on [his] association with [the enterprise], that [he] agreed to predicate acts of . . . robbery."  Barnett, 2016 U.S. App. LEXIS 18394, at *29.  While the government has identified a number of facts that distinguish Stokes' involvement in the RICO conspiracy from that of the female defendant in Barnett, the court ultimately need not decide this issue.  Because the government's evidence was sufficient to establish that Stokes personally committed at least two racketeering acts, the court need not address whether Stokes' conviction may also rest upon other acts that he did not personally commit.

[3]  Likewise, the evidence in the record, including the testimony of Jamar Rice, belies Stokes' characterization of the quantity of narcotics for which he was responsible as a "decidedly modest amount."  Dkt. No. 872 at 6.

created a code to disguise their language when discussing narcotics. Following the murder of Kevin Quick, four members of the Central Virginia line of the 99 Goon Syndikate traveled to Manassas to meet with Halisi and Stokes, the first and second in command. The evidence at trial, including Stokes' own text messages, established that the meeting was important and that attendance was considered mandatory. At that meeting, Stokes recruited Shantai Shelton to distribute narcotics for him in the "Louisa/Charlottesville area," and Shantai agreed to do so. See Dkt. No. 710 at 129. Moreover, as a result of his involvement in the distribution of narcotics, Stokes was able to provide financial support to other members of the 99 Goon Syndikate, including the four members responsible for Kevin Quick's murder, who Stokes assisted while they were evading law enforcement. For these reasons, the evidence presented by the government was sufficient to establish not only that Stokes was involved in a conspiracy to distribute narcotics, but that this racketeering activity was related to the operation of the enterprise.

Second, the government's evidence established that Stokes personally committed the predicate racketeering act of obstruction of justice, in violation of 18 U.S.C. § 1512(c)(1). While Stokes argues in a separate motion that he is not guilty of the charged obstruction offense, the court disagrees for the reasons set forth below.

In sum, the evidence presented by the government, when viewed in its favor, was sufficient to allow a reasonable jury to find that Stokes agreed to commit, and in fact committed, at least two acts of racketeering. Accordingly, Stokes' motion challenging the sufficiency of the evidence as to the third element of the RICO conspiracy offense must be denied.

## II.     Count 36

Count 36 of the superseding indictment charged Halisi and Stokes with obstruction of justice, in violation of 18 U.S.C. § 1512(c)(1).  Under this statute, any person who "corruptly . . . alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding . . . shall be fined under this title or imprisoned not more than 20 years, or both."  18 U.S.C. § 1512(c)(1).  For purposes of the statute, an "official proceeding" includes a proceeding before a federal judge, court, or grand jury, but not a state proceeding.  See 18 U.S.C. § 1515(a)(1)(A).  However, the qualifying proceeding "need not be pending or about to be instituted at the time of the offense, 18 U.S.C. § 1512(f)(1), and the government need not prove that the defendant was aware that the proceeding was federal in nature.  See 18 U.S.C. § 1512(g)(1) ("In a prosecution for an offense under this section, no state of mind need be proved with respect to the circumstance . . . that the official proceeding . . . is before a judge or court of the United States, [or] a Federal grand jury . . . .").

### B.     Halisi's Motion

Halisi's written motion for judgment of acquittal challenges the sufficiency of the evidence to support his conviction for obstruction of justice.  Halisi's argument with respect to this count is essentially a credibility challenge.  Halisi argues that "the only evidence against him regarding the obstruction charge came from Leslie Hope Casterlow," and that Casterlow's testimony was not worthy of belief since she "admitted to lying on numerous occasions to the police and other officials involved in this case."  Dkt. No. 754 at 4.

As explained above, it was the jury's role to assess the credibility of witnesses and resolve any conflicts in the witnesses' testimony.  See Brooks, 524 F.3d at 563.  Because the

8

court is not permitted to analyze the credibility of witnesses or re-weigh their testimony when evaluating the sufficiency of the evidence, Halisi's credibility challenge is without merit. Moreover, while Leslie Casterlow's testimony established that Halisi was directly involved in the efforts to conceal and destroy evidence of the robbery, abduction, and murder of Kevin Quick, it was not the only evidence offered by the government. Instead, the testimony of gang members Shiquan Jackson and Devante Bell revealed that Halisi was involved in the efforts to dispose of Quick's vehicle, and their testimony was corroborated by a series of text messages between Halisi and other gang members. For these reasons, Halisi's motion for judgment of acquittal on Count 36 must be denied.

### C.    Stokes' Motion

Stokes filed a separate motion for judgment of acquittal challenging the sufficiency of the evidence to support his conviction under § 1512(c)(1). Stokes does not claim, nor could he, that the evidence was insufficient to establish his involvement in the destruction of evidence. Instead, relying on the Supreme Court's decisions in United States v. Aguilar, 515 U.S. 593 (1995) and Arthur Anderson LLP v. United States, 544 U.S. 696 (2005), Stokes argues that he is entitled to an acquittal because the government failed to establish a sufficient "nexus" between a proceeding and his obstructive conduct.

In Aguilar, the Supreme Court considered the intent element under 18 U.S.C. § 1503, which makes it unlawful to "'corruptly endeavor[] to influence, obstruct, or impede, the due administration of justice.'" Aguilar, 515 U.S. at 598. In an effort to "place metes and bounds on the very broad language" of the statute, the Supreme Court held that "[t]he actions of the accused must be with an intent to influence judicial or grand jury proceedings," and that "it is not enough that there be an intent to influence some ancillary proceeding, such as an investigation

independent of the court's or grand jury's authority." Id. at 599. The Supreme Court noted that

some courts had "phrased this showing as a 'nexus' requirement – that the act must have a

relationship in time, causation, or logic with the judicial proceedings." Id. (internal citations

omitted). "In other words, the endeavor must have the 'natural and probable effect' of

interfering with the due administration of justice." Id. (internal citations omitted).

In Arthur Anderson, the Supreme Court extended the Aguilar nexus requirement to

prosecutions under 18 U.S.C. § 1512(b), which "make[s] it a crime to 'knowingly use

intimidation or physical force, threaten, or corruptly persuade another person . . . with intent to

cause' that person to 'withhold' documents from, or 'alter' documents for use in, an 'official

proceeding.'" Arthur Anderson, 544 U.S. at 698 (quoting 18 U.S.C. § 1512(b)(2)(A) and (B)).

In that case, the Supreme Court relied on Aguilar to support its conclusion that although "a

proceeding 'need not be pending or about to be instituted at the time of the offense,'" a

proceeding must be at least foreseeable to the defendant. Id. (quoting 18 U.S.C. § 1512(e)(1).

The Court emphasized that a defendant who "'lacks knowledge that his actions are likely to

affect [a] judicial proceeding . . . lacks the requisite intent to obstruct.'" Id. (quoting Aguilar,

515 U.S. at 599).

Neither the Supreme Court nor the United States Court of Appeals for the Fourth Circuit

has decided whether the nexus requirement articulated in Aguilar and Arthur Anderson extends

to prosecutions under 18 U.S.C. § 1512(c)(1). However, at least one appellate court has

determined that the same logic "applies with equal force to § 1512(c)(1) because that subsection,

like § 1512(b)(1), speaks in terms of the relationship between obstructive acts and a

proceeding."[4] United States v. Matthews, 505 F.3d 698, 708 (7th Cir. 2007) (holding that

---

[4] Several appellate courts have applied the nexus requirement to § 1512(c)(2). See, e.g., United States v. Petruk, 781 F.3d 438, 444 (8th Cir. 2015) (collecting cases).

"before a defendant may be convicted of obstruction under § 1512(c)(1), he must believe that his acts will be likely to affect a pending or foreseeable proceeding"); see also United States v. Mann, 685 F.3d 714, 723 (8th Cir. 2012) (assuming arguendo that the "Aguilar nexus requirement" applies to § 1512(c)(1)). In this case, the court finds it unnecessary to decide whether Aguilar and Arthur Anderson apply to § 1512(c)(1). Even assuming that the nexus requirement articulated in those decisions should be imputed to prosecutions under § 1512(c)(1), the evidence at trial established that an official proceeding was foreseeable to Stokes, and that his conduct was intended to affect such proceeding.

The evidence adduced at trial included the testimony of Jamar Rice, who was with Stokes a few days after the murder of Kevin Quick. While the two were traveling to a hotel in Northern Virginia where the other defendants were staying, Stokes received a phone call. Following the call, Stokes appeared nervous. When Rice asked Stokes "what was going on," Stokes initially indicated that Rice "didn't want to know." Dkt. No. 704 at 43. After a few moments, Stokes told Rice that "the fed -- the police had kicked in the door to the place" where they were headed, and that they could no longer go there. Id. On the way back to Manassas, Stokes told Rice that "some of his homies had been involved in some things," more specifically that they had "carjacked a man, they took his car, they ran through his pockets [and] found out he was a police officer, [and] they took him into the woods and they killed him." Id. at 44. Stokes further relayed that, following the murder, "they went to a neighborhood and tried to rob a man that was selling weed," but "[t]hey ended up shooting him [and the] clip fell out of the gun." Id. at 45. Rice testified that Stokes was "concerned" about the clip falling out of the gun, because it could "trace[] the gun back to the murder" and "he was roughly tied into it." Id. at 46. Stokes explained that the firearm had been disassembled but was still in the possession of Leslie

Casterlow.    The government's evidence established that Stokes, Halisi, and Casterlow subsequently drove along I-495 in the middle of the night and disposed of the disassembled firearm by pitching it over a highway barricade.  On the same day that they disposed of the weapon, the internet history on Stokes' phone contained links regarding the search for Kevin Quick, a warrant issued in connection with the search, and the discovery of Quick's vehicle. Additionally, the government's evidence established that the Federal Bureau of Investigation was involved in the investigation from the very beginning.

The evidence presented by the government, when viewed in its favor, established that Stokes knew that his codefendants had murdered an officer, that law enforcement had "kicked in the door" to their hotel room and arrested them, and that the murder weapon – the same weapon used in a subsequent shooting – was with Casterlow, and that Stokes believed that he was tied to it.    Under these circumstances, a jury could easily infer that an official proceeding was foreseeable to Stokes, and that his subsequent involvement in the disposal of the firearm was intended to affect its availability in such proceeding.  Accordingly, the government introduced ample evidence to satisfy any nexus requirement applicable to § 1512(c)(1) under Aguilar and Arthur Anderson.

Stokes also goes one step further and argues that the evidence failed to establish a sufficient nexus to a federal proceeding; in other words, that he should be acquitted on Count 36 because he had no reasonable likelihood of knowing that the investigation into Quick's murder related to a federal proceeding as opposed to a state proceeding.  The court agrees with the government that Stokes' argument in this regard is "contradicted by the plain statutory language." United States v. Stanley, 533 F. App'x 325, 329 n.* (4th Cir. 2013).  "In particular, the statute specifies that a qualifying proceeding 'need not be pending or about to be instituted at

the time of the offense,' 18 U.S.C. § 1512(f)(1), and that 'no state of mind need be proved with respect to the circumstance . . . that the official proceeding . . . is before a judge or court of the United States," id. at § 1512(g)." Id.; see also United States v. Phillips, 583 F.3d 1261, 1264-65 (10th Cir. 2009) ("Mr. Phillips contends that the evidence only demonstrates he was aware Officer Bice was a police officer, not that he was aware of an ongoing or future federal grand jury investigation.  He argues that this is insufficient to establish the requisite mens rea under § 1512(c)(2).  We disagree with Mr. Phillips's assessment of . . . the law . . . . First, § 1512(c)(2) does not require that the defendant knew of the existence of an ongoing official proceeding.  Rather, a conviction under the statute is proper if it is foreseeable that the defendant's conduct will interfere with an official proceeding . . . . Second, § 1512(g)(1) makes clear that the government need not prove the defendant knew that the official proceeding at issue was a federal proceeding such as a grand jury investigation."); United States v. Felton, 500 F. App'x 65,66-67 (2d Cir. 2012) (holding that the defendant's requested jury instruction – "that the government must prove that the defendant foresaw the possibility that [a] lie would make its way to a federal proceeding" – was "an inaccurate statement of the law") (emphasis in original) (citing 18 U.S.C. § 1512(g)(1)).

Moreover, for the reasons discussed during the hearing, the two cases on which Stokes primarily relies to support his federal nexus argument are clearly distinguishable on their facts. See United States v. Petruk, 781 F.3d 444, 446 (8th Cir. 2015) (vacating a defendant's conviction for attempting to obstruct an official proceeding under 18 U.S.C. § 1512(c)(2) where the defendant's conduct in 2012 was "unequivocally directed at obstructing [existing] state proceedings and not the federal proceedings which he was eventually subjected to in 2013"); United States v. Tyler, 732 F.3d 241, 250 (3d Cir. 2013) (holding that the record supported a

petitioner's claim that he was actually innocent of a federal obstruction charge arising from the murder of a witness scheduled to testify against the petitioner's brother in state court, since "there was no evidence that Tyler's conduct was directed at preventing [the witness's] testimony at anything other than as a witness to a state drug offense at Tyler's brother's state trial," and a special agent conceded that no federal case involving the witness had been discussed at the time of her death and there was no plan to use her in a federal proceeding).

For all of these reasons, Stokes' challenges to the sufficiency of the evidence are without merit. Accordingly, the motion for judgment of acquittal on Count 36 will be denied.

## II.   Objections to Stokes' Presentence Report

### A.   Application of the Grouping Rules

Stokes objected to two portions of the presentence report ("PSR") that affected the calculation of the applicable Guidelines range of imprisonment. The first objection pertains to the application of the grouping provisions of the Sentencing Guidelines. The Probation Office grouped the RICO conspiracy count and the obstruction count pursuant to § 3D1.2(a), which provides that "counts involv[ing] the same victim and the same act or transaction" should be placed into a single group for sentencing purposes. See PSR ¶ 90 (citing U.S.S.G. § 3D1.2(a)). The Probation Office then used the guideline provisions applicable to the conspiracy count to determine the adjusted offense level for the grouped charges, since they produced the highest offense level. See U.S.S.G. § 3D1.3(a) ("In the case of counts grouped together pursuant to § 3D1.2(a)-(c), the offense level applicable to the Group is the offense level, determined in accordance with Chapter Two and Parts A, B, and C of Chapter Three, for the most serious of the counts comprising the Group, i.e., the highest offense level of the counts in the Group.").

Pursuant to § 2E1.1 of the Sentencing Guidelines, the base offense level for a defendant convicted of a RICO offense is the greater of 19 or "the offense level applicable to the underlying racketeering activity." U.S.S.G. § 2E1.1. The Application Notes to § 2E1.1 provide that "[w]here there is more than one underlying offense, treat each underlying offense as if contained in a separate count of conviction for the purposes of subsection (a)(2)." U.S.S.G. § 2E1.1 app. n.1. In addition, the Application Notes direct the court to "apply Chapter Three, Parts A, B, C, and D" to determine whether an underlying offense produces an offense level greater than 19. Id.

In Stokes' case, the Probation Office identified three underlying racketeering offenses: robbery (designated in the PSR as Overt Act No. 1), narcotics distribution (designated as Overt Act No. 2), and obstruction of justice (designated as Overt Act No. 3). The Probation Office then calculated the adjusted offense level for each offense. Those calculations resulted in an adjusted offense level of 26 for Overt Act No. 1 (robbery), an adjusted offense level of 19 for Overt Act No. 2 (narcotics distribution), and an adjusted offense level of 30 for Overt Act No. 3 (obstruction of justice). The Probation Office then applied § 3D1.4 to determine the combined adjusted offense level for the underlying offenses. Overt Act No. 1 (robbery) and Overt Act No. 3 (obstruction of justice) were each assigned one unit, which yielded a two-level increase in offense level under § 3D1.4, and a combined adjusted offense level of 32.

In his first objection to the presentence report, Stokes contends that the Probation Office erred by failing to group the predicate racketeering offenses under § 3D1.2 in the same manner that it grouped the offenses of conviction. Stokes further argues that he should not receive a multiple-count adjustment under § 3D1.4, and that his combined adjusted offense level should instead be no higher than 30, which is the adjusted offense level applicable to Overt Act No. 3

(obstruction of justice).  See U.S.S.G. § 3D1.4 app. n.1 ("Application of the rules in §§ 3D1.2 and 3D1.3 may produce a single Group of Closely Related Counts.  In such cases, the combined offense level is the level corresponding to the Group determined in accordance with § 3D1.3 [i.e., the highest offense level of the counts in the Group].").  For the following reasons, the court agrees.

Pursuant to § 3D1.2, "[a]ll counts involving substantially the same harm shall be grouped together into a single group." U.S.S.G. § 3D1.2.  Section 3D1.2 then identifies four categories of counts involving the same harm within the meaning of the provision:

(a) When counts involve the same victim and the same act or transaction.

(b) When counts involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan.

(c) When one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the counts.

(d) When the offense level is determined largely on the basis of the total amount of harm or loss, the quantity of a substance involved, or some other measure of aggregate harm, or if the offense behavior is ongoing or continuous in nature and the offense guideline is written to cover such behavior.

U.S.S.G. § 3D1.2(a)-(d).  Subsection (d) lists a variety of offenses that are specifically excluded from its operation, including robbery, which is covered by U.S.S.G. § 2B3.1.  Subsection (d) makes clear, however, that the "[e]xclusion of an offense from grouping under this subsection does not necessarily preclude grouping under another subsection. U.S.S.G. § 3D1.2(d); see also United States v. White, 810 F.3d 212, 231 (4th Cir. 2016) ("Several courts have made clear that offenses excluded from grouping under Subsection (d) [of § 3D1.2] may nevertheless be grouped pursuant to Subsection (a) or (b).").

After carefully considering the presentence report and the parties' arguments, the court finds it appropriate to group the predicate offenses of robbery and obstruction of justice.[5]  As indicated above, subsection (b) of § 3D1.2 allows for grouping when counts involve the same victim and two or more acts connected by a common criminal objective.  See United States v. Porter, 909 F.2d 789, 793 (4th Cir. 1990) (noting that subsection (b) of § 3D1.2 "allows for grouping where the offenses in question constitute part of the same transaction or part of the same continuing, common criminal endeavor").  Here, the obstructive acts undertaken by Stokes were part of an effort to aid his co-conspirators in avoiding detection for the robbery, abduction, and murder of Kevin Quick, and, thus, "involve[d]" a common victim and were part of a common criminal endeavor. The nexus between the robbery of Quick and the subsequent obstructive acts is illustrated in paragraph 56 of the PSR, which provides, in pertinent part, as follows:

> . . . Under the direction of the leader of the enterprise, Stokes was involved in the efforts to relocate those members involved in the robbery, abduction, and murder of Kevin Quick.  He was further involved in the efforts of the enterprise to destroy documents and evidence associated with the murder of Quick . . . . As second in command, Stokes also directed others to destroy evidence (debit card, bloody clothes, cell phones, firearm, etc.) in furtherance of, and in an effort to conceal, criminal acts . . . .

PSR ¶ 56.

In response to Stokes' objection, the Probation Office highlighted the fact that multiple "robberies" were committed "to fund the racketeering organization," and, thus, that Quick was not the only robbery victim. See id. at ¶ 92.  The problem with this argument is that paragraphs 92 through 97 of the PSR, which calculate the adjusted offense level for the predicate offense of robbery, do not cite to a particular robbery or robbery victim for which Stokes could be held

---

[5] Overt Act No. 2 (narcotics distribution) was not assigned any units under § 3D1.4  and, thus, ultimately had no effect on the defendant's combined adjusted offense level. Thus, the court need not decide whether it should also be grouped with the other overt acts identified by the Probation Office.

responsible, and there is no evidence that Stokes was actually involved in any of the specific robberies committed by the 99 Goon Syndikate. Perhaps for this reason, the Probation Office combined all of the various robberies into one group of robbery offenses, even though they were committed on separate occasions and involved different victims.[6] Because one of the grouped robbery offenses and the obstruction offense involved a common victim and a shared criminal objective, the court believes that the robbery and obstruction offenses are appropriately grouped under § 3D1.2(b). See United States v. Duncan, 311 F. Supp. 2d 757, 762 (N.D. Ind. 2004) (holding that separate counts of conviction for bank robbery and malicious burning of a vehicle qualified for grouping under § 3D1.2(b), since "the burning of the vehicle was part of the Defendant's plan to avoid detection for the bank robbery"). The mere fact that Kevin Quick was not the only victim of the robberies committed by the 99 Goon Syndikate is not dispositive under the circumstances of this particular case, nor is the fact that other members of society can be said to be the victims of obstructive conduct.

The court notes that its decision to group the predicate offenses of robbery and obstruction of justice is consistent with the Probation Office's decision to group the offenses of conviction. The decision is also consistent with the provisions of the Sentencing Guidelines applicable to obstruction of justice, which provide that such offense is ordinarily grouped with the underlying offense with respect to which the obstructive conduct occurred. See, e.g., U.S.S.G. § 3C1.1 app. n. 8. For all of these reasons, Stokes' objection to the application of the grouping rules is sustained, and he will be assigned a combined adjusted offense level of 30, which is the adjusted offense level applicable to the underlying obstruction offense.

---

[6] In this regard, Stokes' PSR differed from those prepared for co-conspirators who were actually involved in the commission of multiple robberies.

## B.    Career Offender Enhancement

Stokes also argues that the Probation Office improperly designated him as a career offender under § 4B1.1 of the Sentencing Guidelines.[7]  Section 4B1.1 provides that a defendant is a career offender if: (1) the defendant was at least eighteen years old at the time of the commission of the instant offense of conviction; (2) the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense; and (3) the defendant has been convicted of two prior crimes, each of which was a felony conviction for either a crime of violence or a controlled substance offense.  U.S.S.G. § 4B1.1(a).  Here, there is no dispute that Stokes was at least 18 years old when he committed the instant offenses.  Instead, Stokes argues that he should not be sentenced as a career offender because neither his instant offenses of conviction nor his prior convictions qualify as "crime[s] of violence" or "controlled substance offense[s]" within the meaning of the career offender provision.

The terms "crime of violence" and "controlled substance offense" are defined in § 4B1.2 of the Sentencing Guidelines.  The newly amended version of § 4B1.2 defines a "crime of violence" as

> any offense under federal or state law, punishable by imprisonment for a term exceeding one year, that –
>
> (1) has as an element the use, attempted use, or threatened use of physical force against the person of another, or
>
> (2) is murder, voluntary manslaughter, kidnapping, aggravated assault, a forcible sex offense, robbery, arson, extortion, or the use or unlawful possession of a firearm described in 26 U.S.C. § 5845(a) or explosive material as defined in 18 U.S.C. § 841(c).

U.S.S.G. § 4B1.2(a) (2016).  A "controlled substance offense" is defined as "an offense under federal or state law, punishable by imprisonment for a term exceeding one year, that prohibits the

---

[7] As a result of being designated as a career offender, Stokes was assigned a base offense level of 32 and a criminal history category of VI.

. . . distribution . . . of a controlled substance . . . or the possession of a controlled substance . . . with intent to . . . distribute . . . ." U.S.S.G. § 4B1.2(b). The application notes to § 4B1.2 further provide that the terms "'[c]rime of violence' and 'controlled substance offense' include the offenses of aiding and abetting, conspiring, and attempting to commit such offenses." U.S.S.G. § 4B1.2 app. n.1.

During the hearing on the parties' objections, Stokes argued that the first issue – whether either of the instant offenses is a crime of violence or a controlled substance offense under § 4B1.2 – is dispositive, and that the court need not decide whether his prior convictions for attempted robbery are qualifying predicate offenses. With respect to this issue, the parties' dispute centers on whether the court must apply a categorical approach in deciding this issue, and focus solely on the statutory definitions of the offenses in question, or whether the court can expand the scope of its analysis to include the particular facts underlying the offenses of conviction. See, e.g., Mathis v. United States, 136 S. Ct. 2243, 2248 (2016) (explaining that when courts apply a categorical approach, they "focus solely on . . . the elements of the crime of conviction" and "ignor[e] the particular facts of the case"); see also Descamps v. United States, 133 S. Ct. 2276, 2285 (2013) (describing the "central feature" of the categorical approach as "a focus on the elements, rather than the facts, of a crime").

While the government argues that the Application Notes to § 4B1.2 contain language suggesting that sentencing courts can consider the specific conduct at issue in determining whether an offense is a crime of violence or controlled substance offense,[8] Stokes correctly points out that the Fourth Circuit has "applied the categorical approach to instant offenses when

---

[8] During the hearing, the government specifically cited to Application Note 2 to § 4B1.2, which provides that "in determining whether an offense is a crime of violence or controlled substance for the purposes of § 4B1.1 (Career Offender), the offense of conviction (i.e., the conduct of which the defendant was convicted) is the focus of inquiry." U.S.S.G. § 4B1.1 app. n.2.

determining whether the defendant should be sentenced as a 'career offender' under the Sentencing Guidelines . . . .'" United States v. Faulls, 821 F.3d 502, 515 n.5 (4th Cir. 2016) (citing United States v. Johnson, 953 F.2d 100, 114 (4th Cir. 1991); United States v. Martin, 215 F.3d 470, 474 (4th Cir. 2000)); see also United States v. Piccolo, 441 F.3d 1084, 1087 & n.6 (9th Cir. 2006) (holding that "the crime-of-violence determination under U.S.S.G. § 4B1.2, a legal question, is properly decided under [a] categorical analysis in cases of both prior and current offenses," and noting that "[t]he Fourth Circuit applies the categorical approach to an instant offense in determining whether that offense qualifies as a crime of violence under the Sentencing Guidelines").  Stokes also persuasively argues that neither of the instant offenses of conviction is categorically a crime of violence or a controlled substance offense for purposes of the career offender provision.

Ultimately, however, the court need not decide this issue.  The court agrees with Stokes that the career offender designation overstates his criminal history, given the age of the prior convictions and the fact that they relate to offenses that were committed when Stokes was only 18 years old.  Thus, even if Stokes technically qualifies as a career offender, the court is of the opinion that a downward departure is warranted.  See U.S.S.G. § 4A1.3(b).  Accordingly, the court will sustain Stokes' objection and sentence him as if he did not have the career offender designation.  Specifically, the court will depart downward to a total offense level of 30 and a criminal history category of V.[9]

---

[9] The court notes that the Probation Office provided a list of disciplinary actions taken against Stokes while he was incarcerated for his prior offenses.  While the court finds that a downward departure from the career offender levels is warranted notwithstanding Stokes' institutional record, the court nonetheless believes, contrary to Stokes' assertion, that a defendant's institutional record can be considered in determining where in the applicable Guidelines range the defendant should be sentenced.

## II.    Halisi's Presentence Report

### A.    Role Enhancement

The government filed one written objection to Halisi's presentence report. Specifically, the government objects to the absence of a role enhancement under § 3B1.1 of the Sentencing Guidelines. The government argues that Halisi should, at a minimum, receive a two-level increase under § 3B1.1(c).

Section 3B1.1(c) provides for a two-level adjustment "[i]f the defendant was an organizer, leader, manager, or supervisor in any criminal activity" involving less than five participants. U.S.S.C. § 3B1.1(c). In determining whether a sentencing enhancement is appropriate under this provision, "titles such as 'kingpin' or 'boss' are not controlling. U.S.S.G. § 3B1.1 app. n.4. Instead, sentencing courts are directed to consider factors such as "the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." Id.

Upon review of the record, the court agrees with the Probation Office that a role enhancement is not appropriate in Halisi's case. While Halisi was identified in the gang's writings as the highest ranking member of the 99 Goon Syndikate, there is no evidence that he was involved in planning or committing any of the particular robbery offenses committed by other members of the gang, or that he claimed a right to a larger share of the proceeds of those crimes. Because the majority of the factors set forth above weighs against the application of a role enhancement, the government's objection is overruled.

**B.**    **Adjustment for Obstruction of Justice**

Halisi also filed objections to portions of his presentence report that affected the calculation of the applicable Guidelines range of imprisonment.  Halisi first challenges the application of a two-level enhancement for obstruction of justice under U.S.S.G. § 3C1.1.  The enhancement was applied on the ground that Halisi committed perjury during trial by "den[ying] guilt under oath" and "den[ying] conduct that forms the basis of the offenses of conviction." PSR ¶ 87.

Pursuant to § 3C1.1, the obstruction-of-justice enhancement applies "[i]f (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice . . . , and (2) the obstructive conduct related to . . . the defendant's offense of conviction and any relevant conduct." U.S.S.G. § 3C1.1.  The enhancement "is not intended to punish a defendant for the exercise of a constitutional right." U.S.S.G. § 3C1.1 app. n.2. Consequently, the sentencing court cannot apply the enhancement "simply because a defendant testifies on his own behalf and the jury disbelieves him." United States v. Bustos-Flores, 362 F.3d 1030, 1037 (8th Cir. 2004) (citation and internal quotation marks omitted).  Instead, to impose the enhancement based on a defendant's testimony, "the sentencing court must find that the defendant '(1) gave false testimony; (2) concerning a material matter; (3) with willful intent to deceive . . . .'" United States v. Perez, 661 F.3d 189, 192 (4th Cir. 2011) (quoting United States v. Jones, 308 F.3d 425, 428 n.2 (4th Cir. 2011)).

Applying these principles, the court is of the opinion that an enhancement for obstruction of justice is not warranted in Halisi's case.  While the jury ultimately discredited at least some of the testimony that Halisi gave at trial, the court believes that the application of an enhancement

would unfairly punish Halisi for exercising his constitutional right to testify on his own behalf. Accordingly, Halisi's objection to the enhancement is sustained.

### C.    Application of the Grouping Rules

Halisi also adopted Stokes' objection to the Probation Office's application of the grouping provisions of the Sentencing Guidelines. For the reasons set forth above, the court will sustain that objection. Like Stokes, Halisi will be assigned a combined adjusted offense level of 30, which is the adjusted offense level applicable to the underlying obstruction offense.

### D.    Acceptance of Responsibility

Halisi's final objection to the calculation of the applicable Guidelines range pertains to the absence of a reduction for acceptance of responsibility under U.S.S.G. § 3E1.1. That section instructs the sentencing court to decrease the defendant's offense level by two if he "clearly demonstrates acceptance of responsibility for his offense," U.S.S.G. § 3E1.1(a), and to decrease it by one more level upon motion of the government if his offense level prior to the two-level reduction was 16 or higher, U.S.S.G.§ 3E1.1(b).

The commentary to § 3E1.1 provides a non-exclusive list of "appropriate considerations" in determining whether a defendant is entitled to a reduction for acceptance of responsibility. U.S.S.G. § 3E1.1 app. n.1. The first consideration is whether the defendant "truthfully admitt[ed] the conduct comprising the offense(s) of conviction . . . and any additional relevant conduct for which the defendant is accountable under § 1B1.3 (Relevant Conduct)." U.S.S.G. § 3E1.1 app. n.1(A). "As a general rule, acceptance of responsibility is inconsistent with a defendant's decision to exercise his right to a trial." United States v. Jones, 233 F. App'x 273, 279 (4th Cir. 2007). The Guidelines, however, provide for a limited exception:

> This adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is

24

convicted, and only then admits guilt and expresses remorse. Conviction by trial, however, does not automatically preclude a defendant from consideration for such a reduction. In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial. This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (e.g., to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct). In each such instance, however, a determination that a defendant has accepted responsibility will be based primarily upon pre-trial statements and conduct.

U.S.S.G. § 3E1.1 app. n.2 (emphasis added).

The court agrees with the Probation Office that this case is not one of the "rare situations" in which a defendant who proceeds to trial may still be entitled to a reduction for acceptance of responsibility. It is clear from the record that Halisi has not fully accepted responsibility for his actions, and that at least some of the reasons he went to trial are directly related to factual guilt. For these reasons, Halisi's objection to the absence of a reduction for acceptance of responsibility is overruled.

### Conclusion

For the reasons stated, the defendants' motions for judgment of acquittal are denied, Stokes' objections to the Probation Office's calculation of the applicable Guidelines range are sustained, and Halisi's objections to the Probation Office's calculation of the applicable Guidelines range are sustained in part and overruled in part.

The Clerk is directed to send copies of this memorandum opinion and the accompanying order to all counsel of record.

DATED: This 9ᵗʰ day of December, 2016.

_____
Chief United States District Judge