## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## CHARLOTTESVILLE DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | **Case No. 3:14-cr-00016-007** |
| **v.** | ) | |
| | ) | |
| **ANTHONY DARNELL STOKES,** | ) | **By: Michael F. Urbanski** |
| **Defendant/Petitioner.** | ) | **Chief United States District Judge** |

## <u>MEMORANDUM OPINION</u>

Anthony Darnell Stokes, a federal inmate proceeding <u>pro se</u>, has moved to vacate his convictions and sentence pursuant to 28 U.S.C. § 2255.[1] The government has filed a response in opposition to which Stokes has replied, making the matter ripe for consideration. After reviewing the record, the court concludes that the motion to vacate must be denied. Because the record conclusively shows that Stokes is not entitled to relief and he has not shown good cause for discovery, the court will also deny his motion for an evidentiary hearing and his discovery requests.

### I.       Procedural History

Following a multi-week trial in 2016, a jury convicted Stokes, Halisi Uhuru (Halisi), Kweli Uhuru (Kweli), Mersadies Shelton (Mersadies), Shantai Shelton (Shantai), and Daniel Mathis (Mathis) of conspiracy to violate the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(d), based on their activities related to a violent gang known as the Double Nine Goon Syndikate (DNGS), a set of the Bloods street gang. Mathis, Shantai, Mersadies, and Kweli (collectively referred to an appeal as the capital defendants) also were

---

[1] This case was originally assigned to Senior United States District Judge Glen E. Conrad, who imposed Stokes' sentence. The case was transferred to the undersigned on April 27, 2021.

convicted, in relation to the kidnapping and murder of an off-duty police officer, of violent crimes in aid of racketeering activity in violation of 18 U.S.C. § 1959 (VICAR).[2] In addition to the RICO conspiracy charge, Stokes and Halisi were convicted of obstruction of justice in violation of 18 U.S.C. § 1512(c)(1) based on their involvement in the destruction of evidence associated with the murder. Stokes was subsequently sentenced to a total term of imprisonment of 160 months.

Stokes' convictions were affirmed by the United States Court of Appeals for the Fourth Circuit on July 31, 2019. See United States v. Mathis, 932 F.3d 242, 258–263 (4th Cir. 2019) (rejecting challenges to the sufficiency of the evidence to support the convictions for RICO conspiracy and obstruction of justice). On December 9, 2019, the Supreme Court denied his petition for a writ of certiorari. See Stokes v. United States, No. 19-6424 (Dec. 9, 2019).

On December 8, 2020, Stokes moved to vacate his convictions and sentence under 28 U.S.C. § 2255.[3] In his original motion, Stokes asserted four claims of ineffective assistance of counsel. See ECF No. 1021. He alleged that his trial counsel (Patrick Kenney) provided ineffective assistance by (1) failing to challenge the validity of a state arrest warrant issued before Stokes was indicted on federal charges; (2) failing to share discovery with Stokes; and (3) failing to call Dominque "DeeDee" Quinn as a witness at trial. Id. at 4–5, 8. Stokes further alleged that his sentencing counsel (Paul Beers, who also served as his appellate counsel)

---

[2] Other crimes of which the capital defendants were convicted included Hobbs Act robberies in violation of 18 U.S.C. § 1951(a), additional VICAR offenses in violation of 18 U.S.C. § 1959, and use or carry of a firearm during and in relation to violent crimes in violation of 18 U.S.C. § 924(c).

[3] Although the court did not receive the motion until December 14, 2020, Stokes declared under penalty of perjury that the motion was placed in the prison mailing system on December 8, 2020. See Houston v. Lack, 487 U.S. 266, 276 (1988) (establishing the prison mailbox rule).

provided ineffective assistance by not requesting a downward adjustment for playing a minimal role in the conspiracy. Id. at 7.

On January 15, 2021, Stokes filed an amended motion to vacate under § 2255, which reframes and supplements the claims asserted in the original motion. See ECF No. 1042. In the amended motion, Stokes asserts the following claims: (1) that "there is no evidence of an affidavit of probable cause to support the [state] arrest warrant, in violation of the Fourth Amendment," and that his car, phone, and motel room "were all illegally searched and all contents thereof illegally seized in connection with the illegal arrest which lacks probable cause"; (2) that trial counsel provided ineffective assistance by "withholding . . . full disclosure of discovery, which includes without limitation concealment of the defective arrest warrant which lacks an affidavit of probable cause"; (3) that trial counsel provided ineffective assistance by failing to contest the absence of an affidavit to support the state arrest warrant; (4) that sentencing counsel "was ineffective for failing to present and develop on appeal the issue of constitutional error for lack of a probable cause affidavit" supporting the arrest warrant; (5) that trial counsel provided ineffective assistance by failing to call Dominque Quinn as a witness at trial; and (6) that sentencing counsel provided ineffective assistance by failing to seek a role reduction at sentencing. ECF No. 1042 at 14–22.

The government filed a response in opposition to the amended § 2255 motion on July 1, 2021, to which Stokes filed a reply. ECF Nos. 1094 and 1113. In his reply, Stokes renews his requests for discovery.[4] ECF No. 1113. He has also filed a separate motion requesting an evidentiary hearing. ECF No. 1184.

---

[4] A previous motion for discovery was denied as premature on January 19, 2021. ECF No. 1041.

3

## II.      Summary of Relevant Facts

In affirming the convictions for RICO conspiracy and obstruction of justice on direct

appeal, the Fourth Circuit summarized the facts as follows:

> The Bloods is a nationwide street gang. Groups of Bloods are
> organized into "sets" or smaller, individual groups of Bloods.
> One of these sets, DNGS, was founded by Halisi, **Stokes**, and
> Kweli in 2013 during their incarceration for crimes unrelated to
> the present case.
>
> DNGS operates through a hierarchical structure. Halisi served as
> "high OG" or "Double OG," DNGS's leader. **Stokes** was
> second in command as "low [OG]." Kweli also held a leadership
> role with the rank of "OG," "Big Homey," or a "Low 020."
> Another DNGS leader was responsible for operations conducted
> by incarcerated DNGS members. These four
> individuals composed DNGS's "Roundtable," or leadership
> council. Reporting to the council were members organized by
> rank, including sergeant, lieutenant, and major. New DNGS
> members held the title of "soldier."
>
> Upon gaining membership into the gang, members were given
> notebooks to study that included the rules and the history of the
> Bloods gang and the DNGS set. Gang members communicated
> using certain codes and phrases in an effort to ensure that their
> communications remained incomprehensible to law enforcement
> authorities and others. Members outwardly reflected their
> association with the Bloods and DNGS by wearing red clothing
> items, including red bandanas, and by obtaining tattoos reflecting
> gang insignia.
>
> DNGS financed itself through the proceeds of various illegal
> activities undertaken by members, including armed robberies,
> home invasions, and burglaries. Members were expected to "put
> in work" to advance their rank in the gang, that is, to commit
> crimes in order to show their commitment and loyalty. If a
> member refused to "put in work," that member likely would have
> been "violated," or beaten.
>
> Both while imprisoned and after their release, **Stokes**, Kweli, and
> Halisi began recruiting new members to the newly formed
> DNGS set, including Shantai, Mersadies, and Mathis. As the

gang's membership grew, DNGS members "put in work" committing a series of crimes from late 2013 into early 2014. This spree of illegal activities included a number of armed robberies of convenience stores, home invasions, burglaries, and other crimes committed in central Virginia.

On the night of January 31, 2014, the capital defendants attacked Kevin Quick (Quick), an off-duty reserve captain with the Waynesboro, Virginia, Police Department, as he was departing his vehicle. The four defendants compelled Quick back into his vehicle at gunpoint, drove him to a nearby ATM, and forced him to withdraw money from his account. After learning that Quick was a police officer, and realizing that Quick had "already seen their face[s]," the capital defendants decided that "it was too late . . . to let [Quick] go." They drove Quick to a remote area off the main roadway, removed Quick from the car, and fired a single shot into Quick's head, killing him and leaving his body behind.

The next day, the capital defendants met with Halisi and **Stokes** in Manassas, Virginia. The defendants rented two hotel rooms to host a "B-House," or a meeting of DNGS members. Throughout that day, the defendants and other DNGS members discussed potential drug trafficking plans and engaged with other drug dealers in transactions involving the distribution of quantities of drugs, including crack cocaine.

The capital defendants left the hotel the next morning and drove in Quick's vehicle to Front Royal, Virginia. Concerned that the vehicle could link them to the murder, the capital defendants bought bleach, rubber gloves, and a jug to hold gasoline for setting the vehicle on fire. Leaving Kweli behind, Mathis, Shantai, and Mersadies drove the vehicle to a friend's house where they cleaned the vehicle with bleach.

Later that day, Mathis and Mersadies committed a robbery. During the robbery, Mathis fired one shot from his pistol. Investigators later recovered a bullet and a cartridge from the scene of this robbery and matched these items through forensic testing to the weapon used in Quick's murder and a previous robbery.

Mathis and Mersadies quickly left the scene of the robbery in Quick's vehicle, which malfunctioned shortly thereafter. They pushed the disabled vehicle to a nearby driveway and doused the

vehicle with additional bleach. After receiving a call from Mersadies asking for help, Halisi and **Stokes** decided that **Stokes** would drive to meet Mersadies and Mathis, as well as Shantai, who had reunited with Mersadies and Mathis. Once **Stokes** reached the group, Mathis and Shantai told him that Quick's vehicle needed to be destroyed, but **Stokes** stated that they would "find a way to get rid of it the next day."

**Stokes** and Halisi later obtained a hotel room in which Mersadies, Mathis, and Shantai could "hide out." As Quick's disappearance became publicized, Mersadies, Mathis, and Shantai discussed absconding to Montana to avoid being arrested. Mersadies informed Kweli of these discussions through frequent text messages.

While Kweli was attempting to have Quick's vehicle destroyed, law enforcement officers located the abandoned vehicle. Evidence technicians recovered the following evidence from the vehicle: Kweli's fingerprint on Quick's driver's license, which was found in Quick's wallet inside the vehicle; fingerprints belonging to Mathis, Shantai, and Mersadies on the vehicle or on items within the vehicle; Mersadies' DNA on a piece of chewing gum left in the vehicle's ashtray; and Mathis' DNA on rubber gloves left in the vehicle.

Once news media reported that Quick's vehicle had been recovered, the defendants planned their escape to Montana and destroyed other evidence related to their crimes. Halisi ordered Leslie Casterlow (Casterlow), who frequently acted as a drug courier for DNGS, to "get rid of" Quick's ATM card. Kweli ordered the other defendants to delete any incriminating text messages. Also, Shantai and one other DNGS member disassembled the gun used to kill Quick and placed the gun components in a pillowcase.

A day after Quick's vehicle was recovered, Mathis, Shantai, and Mersadies were arrested at the hotel. After hearing news of the arrest, Halisi had his girlfriend destroy both his and Casterlow's phones. Casterlow, who still had possession of the murder weapon parts, hid those items behind a dumpster at their hotel.

During this time, **Stokes** was traveling to Washington, D.C. and Maryland to purchase narcotics with an associate, Jamar Rice (Rice), who later became a government witness. After receiving

6

> information from an unidentified caller that law enforcement had raided the hotel to which **Stokes** was returning after his trip with Rice, **Stokes** told Rice that his "homies" had carjacked and killed a police officer, and had left his body in the woods.
>
> **Stokes** returned to Virginia to pick up Halisi, Halisi's girlfriend, and Casterlow. **Stokes** told Casterlow to retrieve the murder weapon components from behind the dumpster and to drive the group to a nearby interstate highway. As Casterlow drove along the highway, **Stokes** threw the murder weapon parts over the wall bordering the road. Thereafter, Halisi, **Stokes**, and Casterlow were arrested at the hotel. Law enforcement officers later recovered the weapon parts with Casterlow's assistance.

Mathis, 932 F.3d at 250–52 (emphasis added and footnotes omitted).

The record reflects that Stokes, Halisi, and Casterlow were arrested in the parking lot of the Value Place hotel in Manassas, Virginia, where they had been staying in Room No. 421. Feb. 11, 2016 Trial Tr., ECF No. 706, at 99. When law enforcement officers went to the room to conduct a search, they found Halisi's girlfriend, Dominque Quinn, leaving the room. Feb. 12, 2016 Trial Tr., ECF No. 960, at 876. The officers recovered two pieces of DNGS-related evidence from Quinn: (1) a .38 caliber Taurus revolver that DNGS member Anthony White had given to Halisi; and (2) a five-page document containing DNGS information. Id. at 865–66, 876.

Stokes, Halisi, and Casterlow were originally arrested on state charges of capital murder in violation of Virginia Code § 18.2-31 and prohibited criminal street gang participation in violation of Virginia Code § 18.2-46.2. See Am. M. Vacate at 14; see also Commonwealth v. Stokes, Case Nos. GC14000749-00 and GC14000760-00, available at https://eapps.courts.state.va.us/ocis/search (last visited Dec. 16, 2022) (search "Stokes, Anthony Darnell"). Shortly after the arrests, law enforcement officers obtained warrants to

search a Samsung cell phone seized from Stokes, a 2006 Volkswagen Jetta in Stokes' possession, and Room No. 421 at the Value Place hotel. See Search Warrant Materials, ECF Nos. 1094-1, 1094-2, and 1094-3; see also Feb. 11 Trial Tr., ECF No. 706, at 24 (discussing the Volkswagen Jetta). A few months later, on May 14, 2014, Stokes, Halisi, Casterlow, the capital defendants, and other DNGS members were indicted on federal charges. See Indictment, ECF No. 3. The grand jury returned a superseding indictment against Stokes, Halisi, and the capital defendants on October 22, 2014. ECF No. 221. Those six defendants proceeded to trial on the superseding indictment, and the jury returned a verdict of guilty on all counts.

## III.    Standards of Review

Stokes has moved to vacate his convictions and sentence under 28 U.S.C. § 2255. Section 2255 sets forth four grounds on which a prisoner in federal custody may collaterally attack a conviction or sentence: (1) "the sentence was imposed in violation of the Constitution or laws of the United States"; (2) "the court was without jurisdiction to impose such sentence"; (3) "the sentence was in excess of the maximum authorized by law"; or (4) the conviction or sentence is "otherwise subject to collateral attack." 28 U.S.C. § 2255(a). The petitioner bears the burden of proof by a preponderance of the evidence. Miller v. United States, 261 F.2d 546, 547 (4th Cir. 1958).

The court may resolve a § 2255 motion without conducting an evidentiary hearing if "the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b). "When the district court denies § 2255 relief without an evidentiary hearing, the nature of the court's ruling is akin to a ruling on a motion for summary judgment."

United States v. Poindexter, 492 F.3d 263, 267 (4th Cir. 2007). In such circumstances, the facts must be considered "in the light most favorable to the § 2255 movant." Id. However, "conclusory allegations" or "airy generalities" are insufficient "to stave off summary judgment or entitle a habeas petitioner to an evidentiary hearing." United States v. Roane, 378 F.3d 382, 400–01 (4th Cir. 2004) (internal quotation marks and citation omitted); see also Jones v. Polk, 401 F.3d 257, 269 (4th Cir. 2005) ("[A] federal habeas court is permitted to hold [an evidentiary] hearing only if the petitioner alleges additional facts that, if true, would entitle him to relief.") (internal quotation marks and citation omitted).

Additionally, "a habeas movant, 'unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of course.'" United States v. Echols, 671 F. App'x 64, 65 (4th Cir. 2016) (quoting Bracy v. Gramley, 520 U.S. 899, 904 (1997)). Instead, discovery is permitted only upon a showing of "good cause." Rule 6, Rules Governing Section 2255 Proceedings. To establish good cause for post-conviction discovery, "[a] habeas movant must make specific allegations establishing reason to believe that, if the facts are fully developed, he is entitled to relief." Echols, 671 F. App'x at 65 (citing Roane, 378 F.3d at 403).

## IV.     Discussion

### A.     Claims of Ineffective Assistance

The court will first address Stokes' claims of ineffective assistance of counsel. Such claims are reviewed under the framework established by the Supreme Court in Strickland v. Washington, 466 U.S. 668 (1984). To prevail on a claim of ineffective assistance, a defendant must prove two elements. First, he must establish that counsel's representation fell below an objective standard of reasonableness. Id. at 687. This requires demonstrating that counsel's

performance was so deficient that he was "not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. Second, the defendant must establish that counsel's deficient performance prejudiced his defense. Id. Specifically, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceedings would have been different." Id. at 694. The defendant must meet both prongs of the Strickland test, and the court may address them in either order. Id. at 697.

### 1. Alleged withholding of discovery

In his first claim of ineffective assistance, Stokes asserts that trial counsel "was ineffective for his willful and intentional withholding of full disclosure of discovery, which includes without limitation concealment of the defective arrest warrant which lacks an affidavit of probable cause." Am. Mot. Vacate at 18. With regard to the affidavit, Stokes alleges that a prosecutor "falsely claimed" during an August 2016 hearing that state arrests warrants "do not need to have probable cause affidavits to support them." Id. at 19. Stokes contends that he would have demanded a Franks[5] hearing if trial counsel had not withheld discovery indicating that his state arrest warrant was not supported by an affidavit. Id. He also suggests that he would have been able to successfully suppress evidence seized following his arrest. See id. ("Petitioner is entitled to suppression of the poisonous fruit from the unlawful seizure.").

In moving to dismiss this claim, the government argues that Stokes is unable to satisfy either prong of the Strickland test. For the following reasons, the court concludes that the claim can be easily disposed of on the basis of lack of prejudice. Accordingly, the court need not address the performance prong. See Strickland, 466 U.S. at 697 ("[A] court need not

---

[5] See Franks v. Delaware, 438 U.S. 154 (1978).

determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.").

As indicated above, in order to establish prejudice under Strickland, a defendant must show "that a there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." Id. at 694. In other words, "Strickland asks whether it is 'reasonably likely' the result would have been different," and the "likelihood of a different result must be substantial, not just conceivable." Harrington v. Richter, 562 U.6. 86, 111–12 (2011) (citing Strickland, 466 U.S. at 693, 696).

Stokes' allegations provide no basis to believe that he was prejudiced by trial counsel's alleged failure to share discovery with him. The only specific discovery materials Stokes claims he did not review with trial counsel were materials related to his state arrest warrant. Contrary to Stokes' assertions, however, the purported absence of an "affidavit of probable cause" did not render the warrant "defective" or otherwise support the need for a Franks hearing. Am. Mot. Vacate at 18.

The court begins by noting that the prosecutor did not falsely claim that Virginia law does not require an affidavit in support of an arrest warrant. Under Virginia law, an arrest warrant may be issued without a written statement establishing probable cause. See Va. Code Ann. § 19.2-72. A "written complaint" is only required by statute "if the complainant is not a law-enforcement officer." Id.

Additionally, and more importantly, the Fourth Amendment to the United States Constitution, which governs the issuance of warrants, "does not require that the basis for probable cause be established in a written affidavit; it merely requires that the information provided the issuing magistrate be supported by 'Oath or affirmation.'" United States v. Clyburn, 24 F.3d 613, 617 (4th Cir. 1994) (quoting U.S. Const. amend. IV). Likewise, the Fourth Amendment "does not 'require that statements made under oath in support of probable cause be tape-recorded or otherwise placed on the record . . . .'" Id. (quoting United States v. Shields, 978 F.2d 943, 946 (6th Cir. 1992)). Accordingly, "magistrates may consider sworn, unrecorded oral testimony in making probable cause determinations during warrant proceedings." Id.

In light of the foregoing case law, Stokes is unable to establish that he was prejudiced by the alleged failure to disclose discovery revealing the absence of an affidavit to support his state arrest warrant. Because the Fourth Amendment does not require that the basis for probable cause be established in a written complaint or affidavit, the absence of an affidavit, standing alone, would not have provided a meritorious basis for challenging the arrest warrant or seeking to suppress evidence seized after the arrest.

Moreover, "the presence (or absence) of probable cause is not the proper subject of a Franks hearing." United States v. Haas, 986 F.3d 467, 475 (4th Cir. 2021); see also United States v. Ross, 400 F. App'x 730, 735 (4th Cir. 2010) (explaining that the "purpose of a Franks hearing is to determine whether the probable cause determination was based on intentionally false statements" and that a defendant is not entitled to a Franks hearing unless he makes a substantial preliminary showing that a false statement was made either intentionally or

12

recklessly). And even if Stokes could have argued that the state arrest warrant was obtained without a proper showing of probable cause, there is no reason to believe that the outcome of the <u>federal</u> proceedings would have been different had this argument been made. Law enforcement officers obtained warrants to search Stokes' phone, vehicle, and hotel room shortly after his arrest, and Stokes does not contest the validity of those warrants. <u>See, e.g.</u>, <u>United States v. Winn</u>, 811 F. App'x 1011, 1014–15 (9th Cir. 2020) (concluding that the seizure of a cellphone from the defendant's person during an initial search did not require the exclusion of evidence obtained from the cell phone pursuant to a federal search warrant, since officers would have inevitably seized the phone and the federal search warrant was an independent source of the evidence from the phone); <u>United States v. Bah</u>, 794 F.3d 617, 633–35 (6th Cir. 2015) (holding that an initial, warrantless search of a cellphone incident to the defendant's arrest "did not taint the subsequent cell phone searches conducted pursuant to the later-obtained search warrant"); <u>United States v. Eccleston</u>, 615 F. App'x 767, 782–83 (4th Cir. 2015) (same); <u>United States v. Jackson-Forsythe</u>, 498 F. App'x 224, 227 (4th Cir. 2012) (holding that "[e]ven if police illegally searched Appellants' hotel room and seized evidence prior to the issuance of the search warrant, the district court properly found that the evidence inevitably would have been lawfully discovered and seized during the execution of the search warrant, which Appellants concede was valid").

Finally, the court notes that the federal prosecution was plainly supported by probable cause, as conclusively established by the indictment. <u>See</u> <u>Durham v. Horner</u>, 690 F.3d 183, 189 (4th Cir. 2012) ("It has long been settled by the Supreme Court that 'an indictment, fair

upon its face, returned by a properly constituted grand jury, conclusively determines the existence of probable cause.'") (quoting Gerstein v. Pugh, 420 U.S. 103, 117 n.19 (1975)).

For all of these reasons, Stokes has failed to show that trial counsel's alleged withholding of discovery prejudiced his defense, and he has offered no reason to believe that post-conviction discovery related to his state arrest warrant would entitle him to relief under § 2255.[6] Accordingly, his motion to vacate will be denied with respect to this claim.

### 2.    Failure to request a Franks hearing

In addition to challenging the alleged withholding of discovery related to his state arrest warrant, Stokes claims that trial counsel provided ineffective assistance by not requesting a Franks hearing to contest the "lack of probable cause affidavit." Am. Mot. Vacate at 20–21. As indicated above, however, "[i]t is settled law in this Circuit that the 'Fourth Amendment does not require that the basis for probable cause be established in a written affidavit,'" Antonio v. Moore, 174 F. App'x 131, 136 (4th Cir. 2006) (quoting Clyburn, 24 F.3d at 617), and that "the presence (or absence) of probable cause is not the proper subject of a Franks hearing," Haas, 986 F.3d at 475. Thus, trial counsel was not ineffective for failing to request a Franks hearing to challenge the absence of an affidavit to support the state arrest warrant. See United States v. Regalado, 518 F.3d 143, 149 n.3 (2d Cir. 2008) (explaining that it is "beyond any doubt" that an attorney's "failure to make a meritless argument does not amount to ineffective assistance"); Moore v. United States, 934 F. Supp. 724, 731 (E.D. Va. 1996) (noting

---

[6] Stokes previously requested discovery confirming whether there was a "verified under oath genuine affidavit of probable cause to support the [state] arrest warrant." ECF No. 1040 at 8. He also sought to obtain information pertaining to the decision to seek the state arrest warrant. See, e.g., id. at 9 ("Identify and describe any and all records, documents, and/or evidence of all the reasons that led the Virginia State Police to believe that probable cause existed to arrest and detain Anthony Darnell Stokes on a gang participation crime alleged as an enhancement charge for the arrest . . . .").

that "there can be no claim of ineffective assistance where . . . counsel is alleged to have failed to raise a meritless argument").

To the extent Stokes otherwise claims that trial counsel was ineffective in failing to "contest the lack of probable cause for the [state] arrest warrant," his conclusory assertion in this regard is insufficient to raise a cognizable claim of ineffective assistance. See United States v. Hawkins, 531 F. App'x 342, 345 (4th Cir. 2013) ("Conclusory allegations are insufficient to raise cognizable claims of ineffective assistance of counsel.") (internal quotation marks and citations omitted). As noted above, Stokes has provided no reason to believe that the result of the federal proceedings would have been different had trial counsel challenged the validity of his state arrest warrant. See, e.g., Braden v. United States, No. 19-5987, 2019 WL 8111957, at *3 (6th Cir. Dec. 10, 2019) (concluding that reasonable jurists would not debate the district court's denial of a claim of ineffective assistance related to the defendant's state arrest warrants, and noting that "nothing prevents federal authorities from arresting, indicting, and convicting [a defendant of a] federal offense even if the state arrest warrant was issued in violation of local requirements"); Aaron v. United States, No. 3:12-cr-00170, 2018 WL 2735103, at *9 (M.D. Fla. June 7, 2018) (holding that a federal defendant's allegations of ineffective assistance lacked merit where the defendant failed to explain "how his federal indictment and arrest [were] implicated, even if the state arrest warrant was invalid"). Consequently, the motion to vacate will be denied with respect to this claim.

### 3.  Failure to appeal the affidavit issue

For the same reasons discussed above, Stokes has no viable claim of ineffective assistance based on appellate counsel's failure to "present and develop on appeal the issue of

constitutional error for lack of a probable cause affidavit." Am. Mot. Vacate at 22. Because

the Fourth Amendment "does not require that the basis for probable cause be established in

a written affidavit," Clyburn, 24 F.3d at 617, counsel was not ineffective for failing to raise this

issue on direct appeal. See Coley v. Bagley, 706 F.3d 741,752 (6th Cir. 2013) ("Omitting

meritless arguments is neither professionally unreasonable nor prejudicial."); see also Hyde-El

v. Vargas, 3:20-cv-000113, 2022 WL 179279, at *5 (W.D.N.C. Jan. 19, 2022) (concluding that

a federal inmate's Fourth Amendment claim "easily fail[ed]" where the inmate alleged that his

Fourth Amendment rights were violated because there was no written complaint or affidavit

to support the issuance of a state arrest warrant). Therefore, the motion to vacate will be

denied with respect to this claim.[7]

### 4.    Failure to call Dominique Quinn as a witness

Stokes next claims that trial counsel provided ineffective assistance by failing to call

Dominique Quinn as a defense witness. Stokes asserts that Quinn's "potential testimony"

could have been used to impeach the testimony provided by other witnesses, including Leslie

Casterlow. Am. Mot. Vacate at 22.

As the government notes in its response, "complaints of uncalled witnesses are not

favored in federal habeas corpus review because the presentation of testimonial evidence is a

matter of trial strategy and because allegations of what a witness would have stated are largely

speculative." Day v. Quarterman, 566 F.3d 527, 538 (5th Cir. 2009); see also United States v.

Terry, 366 F.3d 312, 317 (4th Cir. 2004) (explaining that "the decision whether to call a defense

---

[7] Having concluded that the claim of ineffective assistance lacks merit, the court finds it unnecessary to address the government's argument that the claim is untimely because it was not raised in the initial § 2255 motion that was filed within the one-year period of limitation.

witness is a strategic decision demanding the assessment and balancing of perceived benefits against perceived risks, and one to which [courts] must afford . . . enormous deference") (internal quotation marks and citations omitted). "Thus, to prevail on an ineffective assistance claim based on counsel's failure to call a witness, the petitioner must name the witness, demonstrate that the witness was available to testify and would have done so, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense." Day, 566 F.3d at 538; see also Bassette v. Thompson, 915 F.2d 932, 940–41 (4th Cir. 1990) (noting that a petitioner who challenges counsel's failure to call additional witnesses must describe "what these witnesses might have said, if they had been called," and cannot establish ineffective assistance by generally alleging "that additional witnesses should have been called").

Stokes' claim of ineffective assistance fails to satisfy these requirements. Although Stokes alleges that "Quinn's potential testimony would show that Casterlow's testimony was fabricated and inconsistent with further evidence admitted during the trial," he provides no indication as to what Quinn might have said if she had been called as a witness. Am. Mot. Vacate at 22. Nor does he provide any basis to believe that Quinn would have been willing to testify at trial.[8] His conclusory allegations regarding Quinn's "potential testimony" are insufficient to show that trial counsel's performance was deficient or prejudicial. They also fail

---

[8] As the government notes in its response, the government presented evidence indicating that law enforcement officers recovered gang documents from Quinn when they arrived to search the room at the Value Place hotel in which Stokes and others had been staying. ECF No. 960 at 865. The parties also stipulated that a firearm was found in Quinn's possession, which had been given to Halisi by another DNGS member. Id. at 876. Thus, Quinn likely would have invoked her Fifth Amendment privilege and refused to testify at trial.

to meet his burden of providing good cause to support his related discovery requests.[9] <u>See</u> <u>Ward v. Whitley</u>, 21 F.3d 1355, 1367 (5th Cir. 1994) ("Conclusory allegations are not enough to warrant discovery under Rule 6 . . . ; the petitioner must set forth specific allegations of fact. Rule 6, which permits the district court to order discovery on good cause shown, does not authorize fishing expeditions."). Therefore, the motion to vacate will be denied with respect to this claim.

### 5.    Failure to seek a role reduction at sentencing

In his final claim of ineffective assistance, Stokes alleges that his sentencing counsel was ineffective for failing to seek a sentence reduction for playing a minimal role in the conspiracy. To support this claim, Stokes relies on a statement made during the sentencing hearing. After Stokes presented a lengthy allocution, Judge Conrad advised Stokes that it was his "view that, of the six defendants that went to trial, [Stokes'] culpability was the least." Dec. 12, 2017 Sentencing Tr., ECF No. 951, at 27. Based on this particular statement, Stokes argues that he "would have received at least a four (4) level reduction" under United States Sentencing Guideline ("U.S.S.G") § 3B1.2 if his sentencing counsel had "argued for a minimum role." Am. Mot. Vacate at 24.

Having reviewed the record, the court finds that it conclusively shows that this claim is without merit. The mere fact that Stokes was described as being less culpable than the other defendants who proceeded to trial, four of whom were directly involved in the kidnapping

---

[9] Stokes' prior requests for discovery included a request for "all police reports, notes, documents, or other memoranda pertaining to Dominque 'DeeDee' Quinn's statements to police on or about February 5, 2014," as well as a "private investigator's report of . . . Quinn's interview . . . sometime between May 16, 2014 and May 4, 2018." ECF No. 1040 at 13.

and murder of Kevin Quick, does not establish that he was entitled to a sentence reduction under U.S.S.G. § 3B1.2. See, e.g., United States v. Guerrero-Deleon, 713 F. App'x 163, 166 (4th Cir. 2017) (emphasizing that "a mitigating-role reduction 'is not automatically awarded to the least culpable conspirator'") (quoting United States v. Hassan, 742 F.3d 104, 150 (4th Cir. 2014)). "Such reductions are available only to those conspirators who can prove by a preponderance of the evidence that they are 'substantially less culpable' than their average coconspirator." Id. (quoting U.S.S.G. § 3B1.2 cmt. n.3(A)). In determining whether a defendant is entitled to a reduction under § 3B1.2, courts consider a number of factors, including "the degree to which the defendant understood the scope and structure of the activity"; "the degree to which the defendant participated in planning or organizing the activity"; "the degree to which the defendant exercised decision-making authority"; and "the degree to which the defendant stood to benefit from the criminal activity." Id. cmt. n.3(C). With respect to the four-level reduction available for a "minimal participant," the commentary explains that "the defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role as a minimal participant." Id. cmt. n.4.

Upon review of the record and applicable law, the court concludes that Stokes is unable to establish that counsel was ineffective in failing to request a reduction under § 3B1.2. As the Fourth Circuit noted on direct appeal, Stokes was "second in command" of the DNGS enterprise, and he played "a central role in directing the enterprise, which required its members to commit crimes for the gang's welfare and support." Mathis, 932 F.3d at 250, 260. He recruited members to engage in illegal activities, including the distribution of narcotics, and he

personally benefitted from the criminal acts committed by other gang members. See, e.g., Feb. 8, 2016 Trial Tr., ECF No. 710, at 128–29; Feb. 9, 2016 Trial Tr., ECF No. 695, at 9. Although Stokes was not present for the kidnapping and murder of Kevin Quick, he met with the capital defendants following the murder, obtained a hotel room in which they could "hide out," and personally destroyed the murder weapon. Mathis, 932 F.3d at 251–52. And as Fourth Circuit emphasized in its decision, "Stokes took these actions not only to 'cover up' the crimes that had been committed, but also to prolong the unlawful activities of the DNGS enterprise." Id. at 261.

Based on the evidence presented at trial, sentencing counsel could not have credibly argued that Stokes had a limited understanding of the scope and structure of the criminal activity, that he did not exercise decision-making authority, or that he did not stand to benefit from the criminal activity. See U.S.S.G. § 3B1.2 cmt. n.3(C). Nor could sentencing counsel have credibly argued that Stokes was unaware of "the scope and structure of the enterprise" or "the activities of others." Id. cmt. n.4. It is clear from the evidence that Stokes did not perform a "limited function" in the conspiracy and that he is not "substantially less culpable than the average participant." Id. cmt. n.3(A). Accordingly, Stokes is unable to show that sentencing counsel performed in a constitutionally deficient manner by failing to request a role reduction under § 3B1.2, or that the result of the sentencing proceeding would have been different if such request had been made. Accordingly, the motion to vacate will be denied with respect to this claim.

### B. Claim Challenging the State Arrest and Subsequent Searches of Property

In addition to his claims of ineffective assistance of counsel, Stokes asserts that the "lack of probable cause for [his] state arrest" violated his constitutional rights. Am. Mot. Vacate at 14. In particular, Stokes alleges that "[t]here is no evidence of an affidavit of probable cause to support the [state] arrest warrant" and that his car, phone, and motel room "were all illegally searched and all contents thereof illegally seized in connection with the illegal arrest." Id.

It is undisputed that Stokes did not challenge the issuance of the state arrest warrant or the subsequent searches of property on direct appeal. As a result, the current claim is procedurally defaulted. See United States v. Fugit, 703 F.3d 248, 253 (4th Cir. 2012). To overcome such procedural default, a defendant must establish "(1) that he is 'actually innocent' or (2) 'cause' for the default and 'prejudice' resulting therefrom." Id. (quoting Bousley v. United States, 523 U.S. 614, 621 (1998)).

In his reply brief, Stokes argues that both of his attorneys rendered ineffective assistance by failing to challenge the validity of the state arrest warrant and that their ineffective assistance provides cause to excuse his procedural default. See United States v. Salas, 807 F. App'x 218, 226 (4th Cir. 2020) (noting that a defendant may "establish cause for a procedural default by showing that defense counsel performed deficiently by failing to raise a particular claim") (citing Murray v. Carrier, 477 U.S. 478, 488 (1986)). For the reasons discussed above, however, Stokes has failed to show that either attorney provided ineffective assistance by failing to challenge the validity of the state arrest warrant. Because Stokes has not established

cause and prejudice or actual innocence, the substantive claim challenging his state arrest and the subsequent searches of property is procedurally barred from review.[10]

## V.   Conclusion

For the reasons stated, the court will deny Stokes' motion to vacate under § 2255, his requests for discovery, and his motion for an evidentiary hearing. Additionally, because Stokes has not made a substantial showing of the denial of a constitutional right as required by 28 U.S.C. § 2253(c), the court will deny a certificate of appealability. An appropriate order will be entered.

Entered: December 20, 2022

Digitally signed by Michael F.
Urbanski   Chief U.S. District
Judge
Date: 2022.12.20 14:49:43 -05'00'

Michael F. Urbanski
Chief United States District Judge

---

[10] Even if this claim were not procedurally defaulted, Stokes' primary challenge to the validity of his state arrest—that the alleged absence of a written affidavit rendered the arrest warrant defective—fails to state a cognizable violation of the Fourth Amendment. See Antonio, 174 F. App'x at 136 (citing Clyburn, 24 F.3d at 617). To the extent that Stokes otherwise challenges the validity of his state arrest, his conclusory assertion that the arrest was "illegal" and "lacked probable cause" is insufficient to warrant relief from his federal convictions and sentence under § 2255.